JOURNAL ENTRY AND OPINION
{¶ 1} Jaime Matos appeals from the judgment entered pursuant to a jury verdict finding him guilty of fourteen of thirty counts of rape involving Matos' three daughters who were under age 13 at the time of the crimes. Finding no error in the decision or the proceedings below, we affirm.
 {¶ 2} The following facts presented at trial give rise to this appeal. In the fall of 2001, Mr. Matos was living with his four sons and three daughters. The daughters were ages 12, 11 and 10 at the time. The mother of the children had left the home about six weeks earlier to live with a new boyfriend. In late September of 2001, a family friend, Alex Maldonado, began taking the two older daughters to Sunday church services. Following Sunday services on October 7, 2001, Mr. Maldonado received permission from Matos to take the girls to dinner at another church member's home. After dinner as Mr. Maldonado prepared to leave and return the two girls to their home, the oldest girl began crying and told him that she was sad about going home because her father was touching her.
 {¶ 3} After determining the girl's use of the word "touching" meant sexual abuse, Mr. Maldonado discussed this revelation with his wife, and they decided they would tell the girl's counselor at school on Monday. In response to that decision, the girl began crying and repeated her plea not to be returned to her father because, "It's my turn today."
 {¶ 4} The police were called and responded to the Maldonado home. After speaking with the two girls, they decided to go to the Matos home and remove the other children. All seven children were temporarily placed with the Maldonados.
 {¶ 5} Shortly after that placement, Matos' three daughters were interviewed by Tosca Cobbien, an intake sexual abuse social worker with the Cuyahoga County Department of Children and Family Services. Following the three interviews, Cobbien determined the allegations of sexual abuse by two of the three girls were "indicated"[1] and referred all three girls to the Metro Alpha Clinic for medical evaluation. During this initial interview, the youngest of his three daughters denied being sexually abused by Matos.
 {¶ 6} On October 10, 2001, Detective Karl Lessmann continued the investigation for the police department by interviewing several people including the officer who responded to the initial call from the Maldonados, the girls' mother Aileen Lugo, Mr. Maldonado, and Tosca Cobbien.
 {¶ 7} On October 22, 2001, a thirty-count indictment was filed against Matos alleging multiple rapes of his three daughters.
 {¶ 8} On October 29, 2001, Dr. David Bar-Shain conducted physical evaluations of all three girls. The evaluation began with obtaining a medical history from the girls including the events relating to the sexual assault by Matos. In the course of obtaining that medical history, all three girls were asked if Matos had sexually abused them. Two of the three girls recounted their sexual abuse by Matos. One of them denied being sexually abused by Matos. This daughter was again evaluated by Dr. Bar-Shain on March 11, 2001. At this evaluation, she admitted specific occurrences of sexual abuse by Matos she had previously denied. She testified at trial to being sexually abused by Matos in the same manner as her two sisters were abused.
 {¶ 9} On April 15, 2002, Matos' trial began in Cuyahoga County Common Pleas Court. At trial, the oldest daughter testified to being summoned by Matos to her parents' bedroom on several occasions and being sexually abused by him in the dimly lit room. She recounted for the jury how Matos ordered her to his room one night when her mother was in a hospital emergency room for an asthma-related condition. Matos ordered her to remove her clothes and lay on his bed. He began touching her vaginal area and eventually applied lotion to his finger and inserted it into her vagina. He simultaneously began kissing her on her mouth and then kissing and licking her vagina. This particular occasion was interrupted by a call from Lugo requesting a ride home. Matos concluded his assault and then left to pick up Lugo at the hospital. He threatened his daughter that he would cut her with a knife if she told anyone about what happened.
 {¶ 10} Matos' next oldest daughter testified that Matos sexually assaulted her in her parents' bedroom by touching and kissing her vaginal area and touching her with his penis. He also forced her to have sexual intercourse with him and admitted that "it hurt." Following that, Matos put "his private part in [her] mouth." She was assaulted in this way at least "five or six" times.
 {¶ 11} Matos' youngest daughter initially denied that she had been abused to Ms. Cobbien and Dr. Bar-Shain. At trial, she testified that she did so because she "was still afraid at the moment." This youngest daughter eventually admitted to her current foster parents, the Maldonados, that she had been sexually abused by Matos as well. She also drew a picture to express her fear about the situation. The picture was a self-portrait in which she drew a rope around her head and blood coming from her neck. Alongside the image of herself, she drew her father holding a large knife.
 {¶ 12} The Maldonados returned to Dr. Bar-Shain with Matos' youngest daughter to have her re-evaluated, and she admitted to him she had been sexually abused and threatened by Matos.
 {¶ 13} At trial, this youngest daughter recounted an event that occurred when she was age ten. Matos brought her into her parents' bedroom at night. While her two younger brothers, age three and four slept in the corner, she testified that Matos began kissing her on the mouth and "touching my butt." As he was assaulting her, she testified that "he tried to threaten me."
 {¶ 14} The two older daughters recounted their abuse to the police, to Ms. Cobbien, to Dr. Bar-Shain, and finally to the jury at trial.
 {¶ 15} Ms. Cobbien and Dr. Bar-Shain both testified regarding the form and substance of the incidents as told to them by the two older daughters. Dr. Bar-Shain testified about his findings regarding all three girls. Both Cobbien and Bar-Shain independently assessed the girls' accounts as credible. They based this opinion on their interviews with all three girls and their experience in assessing claims of sexual abuse by children.
 {¶ 16} The trial concluded with closing arguments on April 18, 2002. On April 19, 2002, the jury found Matos guilty of fourteen of thirty counts of rape. On April 28, 2002, Matos was sentenced to life imprisonment on counts one through ten, life imprisonment on counts eleven through thirteen, and three years' imprisonment on count fourteen. The two life sentences are being served consecutively, while the three-year sentence is being served concurrently with the life sentences.
 {¶ 17} Matos advances one assignment of error for our review.
 {¶ 18} "The prosecutor committed misconduct during closing argument (1) by urging the jury to convict appellant because they have a `duty to protect children,'(2) by assuring the jury that he reviews the cases for trustworthiness prior to trial, and (3) by arguing to the jury that defense counsel was objecting during closing argument because `he doesn't want [him] to speak.'"
 {¶ 19} As Matos is not challenging the sufficiency of the evidence or the manifest weight of the evidence, we review the conduct of the trial for the effect, if any, of the alleged prosecutorial misconduct.
 {¶ 20} The prosecution is normally entitled to a certain degree of latitude in its concluding remarks.[2] A prosecutor is at liberty to prosecute with earnestness and vigor, striking hard blows, but may not strike foul ones.[3] It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury.[4]
 {¶ 21} The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.[5] The analysis is the fairness of the trial, not the culpability of the prosecutor.[6]
 {¶ 22} Matos highlights three comments made by the prosecutor during closing argument to support his claim that he is entitled to a new trial. The first comment involved the prosecutor's statement regarding a "duty to protect children."
 {¶ 23} "Mr. Cahill [prosecutor]: * * * One of the most frequent questions I get asked is, how can you do those cases? It's disgusting. I say, well, somebody has to protect the children.
 {¶ 24} "As I asked you before —
 {¶ 25} "Mr. Wade [defense counsel]: Objection.
 {¶ 26} "Mr. Cahill: — we all have a duty to protect children.
 {¶ 27} "Mr. Wade: Objection.
 {¶ 28} "The Court: Overruled"
 {¶ 29} The comment by the prosecutor regarding a "duty to protect children" must be considered in context. The comment was made during the rebuttal portion of the state's case. As such, defense counsel had already concluded his closing argument. During defense counsel's closing argument, he made the following comment:
 {¶ 30} "I know when I questioned the witnesses, sometimes I can be quite obnoxious * * *. So, I don't apologize for that, that's the way I do things. As a defense attorney, I protect the entire community from tyranny. If the government wants to run over you, there's someone to protect you, to make sure that your rights are protected in this courtroom or in any courtroom."
 {¶ 31} Viewed in context, the prosecutor's "duty to protect children" comment was a direct response to defense counsel's comment that defense attorneys protect "the entire community from tyranny." Moreover, the "duty to protect children" comment by the prosecutor can be viewed with the recognition that prosecutors may argue with "earnestness and vigor, striking hard blows, but not * * * foul ones."[7]
 {¶ 32} Matos next objects to a comment by the prosecutor responding to defense counsel's objections during the prosecutor's closing argument.
 {¶ 33} "Mr. Cahill: He's already objecting to what I already have to say.
 {¶ 34} "Mr. Wade: Objection, your Honor.
 {¶ 35} "The Court: Overruled.
 {¶ 36} "Mr. Cahill: Mr. Wade, it's my turn.
 {¶ 37} "My duty is to protect children, and that's why I do this, and that's my response when people ask me that."
 {¶ 38} During this same exchange, the prosecutor again remarked on defense counsel's repeated objecting.
 {¶ 39} "Mr. Cahill: He still doesn't want me to speak.
 {¶ 40} "The Court: Keep going. Overruled.
 {¶ 41} "Mr. Cahill: He still doesn't want me to talk about this * * *."
 {¶ 42} The prosecutor made at least two comments regarding defense counsel's objections being motivated by a desire to not allow the prosecutor to speak. Matos argues the prosecution's comments implied Matos' counsel was doing something other than enforcing procedural rights (i.e., trying to hide "the truth" the prosecutor was offering). It is improper for an attorney to denigrate opposing counsel's assertion of his right to object in front of a jury.[8] In this instance, however, the prosecutor was responding to repeated objections by defense counsel during his closing argument. The objections made by defense counsel, and repeatedly overruled, were so numerous that the judge called both parties to side bar after which defense counsel's objections subsided.
 {¶ 43} Finally, Matos objects to the prosecutor's comment implying he screens witnesses for credibility prior to deciding whether to bring a case to trial:
 {¶ 44} "One of the very first things I look for when I am assigned a case, one of the very first things I look for when I read through the case, and the child has made these allegations, is there an underlying motivating factor? Is there something underlying?
 {¶ 45} "And folks, in some cases, there are and they never get this far.
 {¶ 46} "Mr. Wade: Objection.
 {¶ 47} "Mr. Cahill: Maybe there's an ongoing custody battle
 {¶ 48} "The Court: Overruled."
 {¶ 49} The prosecutor's comment about what he looks at when analyzing his cases prior to trial attempted to convey to the jury that the prosecutor had pre-screened this case and the victim-witnesses for accuracy and honesty. These comments are an endorsement by the prosecutor of the witnesses' truth-telling — an endorsement he clearly hopes the jury will adopt. We agree with Matos that this comment by the prosecutor was improper.[9]
 {¶ 50} It is improper for a prosecutor to imply to a jury that he has screened a case or witness for credibility prior to trial. A prosecutor should not attempt to cause the jury to replace its own independent analysis of witness credibility with the prosecutor's presumptive expertise at "pre-screening" victims and witnesses for honesty as a service to the jury. Comments suggesting a pre-screening of witness credibility by prosecutors are a disservice to juries and our justice system.
 {¶ 51} The analysis for this court does not end with a determination of whether comments in closing argument were improper. We must determine whether these comments, considering the entirety of evidence presented at trial, prejudicially affected any substantial right of Matos to a fair trial.[10]
 {¶ 52} All three victims in this case testified in front of the jury. They were cross-examined by defense counsel. Matos also took the stand to deny his daughters' claims of sexual abuse. The state also presented qualified and experienced professionals who deal with allegations of sexual abuse on a regular basis. Those professionals testified uniformly that their evaluations resulted in a determination that the girls' claims of sexual abuse were valid.
 {¶ 53} Matos was indicted on 30 counts of rape. The jury returned a verdict of guilty on 14 of the 30 counts and a verdict of not guilty on 16 counts. This establishes that the jury conducted an independent and impartial review of the testimony and evidence in arriving at its verdict. The jury did not simply accept all the testimony as true on its face. The verdict indicates the jury was not overwhelmed by the comments made by the prosecutor in the state's closing argument such that the jury abdicated its responsibility to make an independent analysis.
 {¶ 54} Our analysis here is the overall fairness of the trial and not the culpability of the prosecutor for improper comments in closing argument.[11] Considering the entirety of evidence presented at trial, we find that these comments did not prejudicially affect any substantial right of Matos to a fair trial.
 {¶ 55} Finally, Matos' reliance on Keenan as analogous to the prosecutor's comments in this case is misplaced.
 {¶ 56} Keenan involved repeated instances of improper comments by the prosecutor throughout "much of the trial and in closingargument."[12] During trial and especially his closing argument, the prosecutor in Keenan repeatedly appealed to the jury's emotion and injected his personal opinion and emotion into his statements in front of the jury and denigrated defense counsel.[13] The Keenan court noted, however, that "the closing argument must * * * be reviewed in its entirety to determine if the prosecutor's remarks were prejudicial [and that reversal of a conviction for prosecutorial misconduct is not proper] except in rare cases."[14] The only conduct of the prosecutor complained of in this case by Matos occurred during closing argument.
 {¶ 57} In analyzing Matos' assignment of error, we consider the prosecutor's closing argument comments in light of the entirety of the evidence presented at trial as part of our due process analysis.[15] In so doing, we cannot say these comments by the prosecutor during closing argument prejudicially affected any of the substantial rights of Matos or affected the fairness of the trial as a whole.
 {¶ 58} This assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, P.J., concurs and TIMOTHY E. McMONAGLE, J., concurs in judgment only.
[1] Ms. Cobbien testified that her interviews with possible victims of sexual abuse result in one of three dispositions: "substantiated" (meaning personal disclosure by the victim and medical evidence corroborating that disclosure); "indicated" (meaning personal disclosure without medical evidence corroborating that disclosure); and "unsubstantiated" (no personal disclosure and no medical evidence of sexual abuse).
[2] State v. Woodards (1966), 6 Ohio St.2d 14.
[3] Berger v. United States (1935), 295 U.S. 78.
[4] State v. Potter, Cuyahoga App. 81037, 2003-Ohio-1338.
[5] Id.
[6] Smith v. Phillips (1982), 455 U.S. 209.
[7] Berger, supra.
[8] State v. Keenan (1984), 14 Ohio St.3d 13.
[9] State v. Thayer, supra.
[10] Potter, supra.
[11] Smith v. Phillips, supra.
[12] Keenan, supra. (Emphasis added.)
[13] Id.
[14] Id.
[15] Smith v. Phillips, supra.